```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,
                                    CR Action
            Plaintiff,              No. 1:21-525

      vs.                           Washington, DC
                                    August 31, 2021
SAMUEL LAZAR,
                                    2:57 p.m.
            Defendant.
_____/


        TRANSCRIPT OF CONTINUED DETENTION HEARING
       BEFORE THE HONORABLE ROBIN M. MERIWEATHER
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:      DOUGLAS COLLYER
                        DOJ-USAO
                        Gateway Building
                        14 Durkee Street, Rm 340
                        Plattsburgh, NY 12901


For the Defendant:      DAVID BENOWITZ
                        RAMMY BARBARI
                        MATTHEW WILSON
                         PRICE BENNOWITZ LLP
                         409 7th Street, NW, Ste 200
                         Washington, DC 20004




Reported By:     LORRAINE T. HERMAN, RPR, CRC
                 Official Court Reporter
                 U.S. District & Bankruptcy Courts
                 333 Constitution Avenue, NW
                 Room 6720
                 Washington, DC 20001
                 202-354-3196
```

1       **P R O C E E D I N G S**

2               COURTROOM DEPUTY:  Criminal case number 2021-525,

3       the United States of America versus Samuel Lazar.  Douglas

4       Collyer representing the government, David Benowitz

5       representing the Defendant, Da'Shanta' Valentine-Lewis is

6       the pre-trial services officer, Autumn Hickey is the

7       proposed third-party custodian, the Defendant is

8       participating by video.

9               This case is called for an arraignment and a

10      continuation of a detention hearing.

11              THE COURT:  Just a moment.

12              COURTROOM DEPUTY:  Mr. Benowitz, were you going to

13      be on video?

14              MR. BENOWITZ:  I wasn't planning on it.  I am a

15      little under the weather.

16              COURTROOM DEPUTY:  Okay.

17              THE COURT:  So I see that it looks like the

18      indictment was returned after our last hearing.  Are defense

19      counsel prepared to go forward with the arraignment on those

20      charges today?

21              MR. BENOWITZ:  Your Honor, we are actually not

22      prepared.  Mr. Lazar was unexpectedly transferred from

23      Lehigh Valley Detention Center to Philadelphia.  We've had

24      no contact with him until today.  So we were just able to

25      catch up, essentially, and show Mr. Lazar the photos, and

1    there are some Facebook posts that Mr. Collyer produced this

2    morning.  We were just able to have some conversation about

3    that.  So we are not really prepared to go forward with an

4    arraignment.  I think just to finish the detention hearing

5    would be an accomplishment, frankly.

6              THE COURT:  Okay.  Thank you, Mr. Benowitz.

7              Turning then to the detention hearing, resuming

8    where we were at the last hearing, the United States had

9    presented some photographs as exhibits that had been

10   discovered shortly before the hearing, and we continued the

11   hearing so that defense would have an opportunity to review

12   them and make argument.

13             Mr. Benowitz, did you get enough of an opportunity

14   to speak with Mr. Lazar for me to at least hear from the

15   government and something from the defense on how this new

16   information effects the previously-made arguments?

17             MR. BENOWITZ:  Yes.

18             THE COURT:  Okay.  Great.  I thought that was what

19   you were saying, but I just wanted to be clear for the

20   record.

21             MR. BENOWITZ:  Yes, Your Honor.

22             THE COURT:  Okay.  Thank you.

23             Mr. Collyer, I'll hear from you on that.  But

24   before we do that, I did have a question for you.  In the

25   detention memorandum there's an assertion.  Let me find the

1    page -- there's a description of -- it's probably in the

2    history and characteristics portion.  It indicates that for

3    one of the state court offenses, Mr. Lazar had been

4    sentenced to 23 months.  Yeah, this is the page, Page 14 of

5    the detention memorandum, the first sentence under history

6    and characteristics, where it says, "There are prior

7    misdemeanor convictions including a 2004 conviction for

8    criminal mischief for which he was sentenced to a

9    time-served sentence of 23 months in jail."

10              Our pre-trial report seems to only list a fine.  I

11    will admit I didn't backstop that against the EDPA pre-trial

12    report.  But I was wondering what that 23 months in jail,

13    what the factual basis was for that representation in the

14    memo.

15              MR. COLLYER:  Yes, Your Honor.  I believe that is

16    what was referenced in the police report regarding the 2016

17    gun incident.  In reviewing the reports from the 2016

18    incident where he attempted to obtain a firearm, those

19    police reports reflect that in 2004 he served 23 months,

20    which would thus make him ineligible to have a firearm.

21              THE COURT:  So that was going to be my follow-up

22    question.  Is it the government's position or belief that

23    Mr. Lazar is not eligible to have firearms?

24              MR. COLLYER:  It would appear to be so, Your

25    Honor, that there's at least two occasions where a NICS

1    check was run and he was denied.

2            THE COURT:  Okay.  You can now make arguments

3    about the additional information posted in our last

4    substantive argument on the detention.

5            MR. COLLYER:  Thank you, Your Honor.

6            On August 16th, 2001 the government became aware

7    of photographs that depict the defendant's participation in

8    a rally on or about August 17th, 2020, which consisted of

9    his holding and aiming firearms on a public street corner,

10   reportedly in Palmyra, Pennsylvania's business district.

11           In the photos the defendant is holding an assult

12   rifle that has a 30-round magazine inserted in it.  Now,

13   whether there are rounds in that magazine, I can't say, but

14   it appears from the photo that the gun could be loaded.

15   These actions are so dangerous that the community itself

16   took note of it online, and that is what led to that

17   posting.

18           Additionally, last night I began to review the

19   defendant's Facebook search warrant returns, and there's a

20   post on his page that he did not originally write but it

21   says, "Arm up.  March to D.C. euthanizing every Antifa, BLM

22   member you find on the way.  Drag every last one of the

23   democrats and DNC members out of their offices and homes and

24   publicly execute them for their crimes against this country

25   and its citizens."

1    Now, the defendant did not write those words,

2  however, it appears from the post that he loved that post,

3  and then screenshotted it, drew a circle around those words,

4  then drew an arrow pointing to those words and posted it.

5  So the government would submit that even though he didn't

6  write those words, he has certainly adopted those words as

7  his own.

8    He also posted a meme that says, "Operation occupy

9  the Capitol, taking back our country from corrupt

10  politicians, January 6th, 2021, all 50 states, 12:00 noon,

11  #WeAreTheStorm, #1776rebel, #OccupyCapitals."  Again, this

12  was posted by a man who went to D.C. wearing body armor, had

13  his face painted in camoflauge design, was armed with pepper

14  spray and called for in battle.

15    The government has presented a pattern of criminal

16  behavior by this defendant, but not just a pattern of

17  criminal behavior, a pattern of escalating criminal

18  behavior.  In 2004, it was criminal mischief for damaging

19  property.  In 2016, it was lying to obtain a firearm.  In

20  2020, it was possessing and aiming firearms on a public

21  street and adopting posts about executing politicians and

22  euthanizing other people.

23    Finally, on January 6th, 2021, it was assaulting

24  police officers at the U.S. Capitol.  Which begs the

25  question, Your Honor, what's next if this defendant is

1    released?

2          For those reasons stated today and the reasons

3    stated previously, the government submits that there is no

4    condition or combination of conditions that can reasonably

5    assure the safety of the community or any person, and that

6    the defendant should be detained.  Thank you.

7          THE COURT:  What is the time frame of the Facebook

8    posts?  Can you tell that from what you've searched?  Are

9    they dated?

10          MR. COLLYER:  In the format in which I was

11    reviewing it, they are not dated.  I can tell from the

12    context around it that they predate January 6th, 2021, and I

13    believe would have been in or about December of 2020.

14          THE COURT:  Okay.  Thank you.

15          Who will be arguing for the defense?

16          MR. BENOWITZ:  Your Honor, I will.

17          THE COURT:  Okay.

18          MR. BENOWITZ:  Thank you.

19          Your Honor, first I wanted to just respond to the

20    Court's question about the criminal mischief convictions

21    that the Court raised with Mr. Collyer.

22          THE COURT:  Yes.

23          MR. BENOWITZ:  My understanding is that Mr. Lazar

24    served approximately 45 days in jail on these charges.

25    Which, again, my understanding were misdemeanors that may

1    have carried more than one year, the possibility of more

2    than one year in jail.  I think, again -- and I don't

3    believe I've seen the police reports related to the further

4    -- to the more recent case that Mr. Collyer referenced.

5         My theory, frankly, is that this may have been

6    listed somewhat inartfully as a time-served, 23-month

7    sentence.  It may have actually been a suspended sentence

8    with time served.  In other words, he served approximately

9    45 days of a 23-month sentence, which would have been

10   possible if there were several misdemeanors strung together.

11   Of course, in 2004, Mr. Lazar was, I believe, approximately

12   18 or 19 years old, for further context.

13        With respect to the photographs that referenced

14   this rally in August of 2020, there's again -- we would

15   agree there is no evidence that these weapons -- the weapon

16   that Mr. Lazar -- if it, in fact, was a real weapon, whether

17   it was loaded, and it certainly was not fired.  There is

18   certainly no evidence that it was fired.

19        And I think that there may have been -- in fact,

20   there was some confusion on Mr. Lazar's part.  Mr. Lazar

21   certainly had attempted to purchase a firearm when he

22   sustained the further conviction, I believe misdemeanor

23   conviction, in 2015 or 2016, with respect to his filling out

24   the ATF form.  I'm familiar with that form, and it can be

25   confusing.  Because Mr. Lazar is not a felon, but he does

1    have a conviction that carries more than one year in jail,

2    which I think can be confusing for a layperson.

3                 He certainly understood after that conviction that

4    he couldn't purchase a firearm.  And I think -- I've seen

5    this with other people where they certainly don't

6    understand.  They understand they can't purchase a firearm,

7    but as far as temporarily holding one, posing with one, as

8    is shown in these photographs, that's certainly a different

9    story.

10                With respect to the Facebook post that Mr. Lazar

11   -- or at least someone with access to Mr. Lazar's

12   Facebook -- screenshotted and liked and as well as the meme,

13   of course, this all predates January 6th.  Of course,

14   Mr. Lazar didn't actually write the post.  He certainly

15   didn't create this meme.

16                And I would, again, point to the huge

17   differentiating factor in this case, which is the time

18   between January 6th and the time that Mr. Lazar was arrested

19   in this case.  There is simply no -- you know, that belies

20   the very point that the government is making, which is the

21   government asserts that there is this escalating course of

22   conduct; and that just is not the case, based on the time

23   between January 6th and today.

24                As we previously discussed, Ms. Hickey, who is

25   living with Mr. Lazar at his home in Pennsylvania, has been

1    qualified as a third-party custodian.  The Court could place

2    Mr. Lazar on the most extreme form of home confinement,

3    which I believe is home incarceration, which would not allow

4    Mr. Lazar to leave his home for anything but court-approved

5    activities, such as a doctor's appointment or anything

6    related to his case.

7              I think that for those reasons that there are

8    clearly a combination of conditions that the Court can

9    impose in this case that would assure the safety of the

10   community.  I don't believe -- the government has not

11   asserted risk of flight as a concern in this case.  So I

12   will not be arguing that.

13             THE COURT:  Okay.  Thank you, Mr. Benowitz.

14             Mr. Collyer, did you have any further rebuttal

15   arguments?

16             MR. COLLYER:  Yes, Your Honor, just briefly.

17             Even if this concept of somebody knowing they

18   can't purchase a firearm but not knowing that that means

19   they can't hold the firearm, even assuming that to be true,

20   assuming that to be understood here, it still doesn't

21   explain what the defendant did.

22             What this defendant did was hold firearms, aiming

23   them into the air, aiming them down the street, of a public

24   street, in what appears to be very plainly the middle of the

25   day.

1          Also, the time frame between January 6th and now

2     is not relevant.  The defendant -- first off, it's

3     escalating criminal behavior where he's gone years between

4     criminal activity but has returned to criminal activity,

5     which as I said, has escalated.  But, also, it essentially

6     amounts to an argument of "I haven't assaulted somebody

7     since the last time I assaulted somebody.  I haven't used

8     violence since the last time I used violence," which was

9     eight months ago.  So it's really not relevant or indicative

10    of a non-violent tendency at all to say, I haven't used

11    violence in eight months.

12          With respect to the third-party custodian, I would

13    just note that the defendant is an adult.  A third-party

14    custodian -- there is no adult who is going to tell the

15    defendant what he can and can't do, if he wants to do it.

16    He's an adult.  Another adult is not going to stop him from

17    doing what he wants.  So the concept of a third-party

18    custodian, I would submit, is just not something that would

19    hold up as a valid reason for releasing him.

20          Thank you very much.

21          MR. BENOWITZ:  Can I just respond to one point

22    that Mr. Collyer made?

23          THE COURT:  Yes.

24          MR. BENOWITZ:  Thank you.

25          With respect to the third-party custodian, the

1    point of the third-party custodian is not so much to be

2    directing the defendant, Mr. Lazar.  It's to be monitoring.

3    And as the Court knows, to report to the Court if there's a

4    violation of conditions of release.  Of course, the

5    third-party custodian is really one of several conditions

6    that can be put into place.  The main one being home

7    incarceration with electronic monitoring, which is really

8    the cornerstone of the conditions that allow -- in recent

9    years as they've been instituted, have allowed more people

10   to be released because it's this very, very strict

11   confinement, but it allows people to be outside of a

12   detention facility.

13            THE COURT:  Thank you.

14            I'm cognizant of the fact that I have another

15   hearing set for 3:30.  I will keep this brief.  I am just

16   planning to deliberate for a bit, and I'm going to turn off

17   my camera but stay connected.

18            (Break.)

19            THE COURT:  Okay, Ms. Kay.  I'm ready to resume.

20            COURTROOM DEPUTY:  Okay, Your Honor.

21            THE COURT:  The pending motion before the Court

22   requests that the defendant, Samuel Lazar, be held without

23   bond pending trial.  Under the Bail Reform Act, the

24   government argues in its detention memorandum that there are

25   no conditions or a combination of conditions that the Court

1      could set that would reasonably assure the safety of the

2      community if Mr. Lazar were to be released.

3              The United States has the burden of proving by

4      clear and convincing evidence that Mr. Lazar poses too great

5      a danger to the safety of the community to be released.  The

6      defense opposes that motion, seeks release and asserts that

7      stringent release conditions, such as home incarceration

8      with a third-party custodian, would adequately ensure the

9      safety of the community.

10             Turning to just the eligibility for pre-trial

11     detention, 18 United States Code, Section 3142(f)(1)(a),

12     makes Mr. Lazar eligible for detention because of the nature

13     of his charges.  The charges under 18 United States Code

14     Section 111, that he's been charged with, meet the criteria

15     for a crime of violence, as the Court recognized in the

16     *United States v. Kl*ein, which is 2021 Westlaw 1377128 and

17     *United States versus Padilla*, which is 2021 Westlaw 1751054.

18             Having established that Mr. Lazar is eligible for

19     pre-trial detention, I must conduct an analysis that is

20     guided by the Bail Reform Act as well as recent D.C. Circuit

21     precedent interpreting that statute.  Under the Bail Reform

22     Act, I am required to consider four factors to determine

23     whether Mr. Lazar should be held without bond pending trial.

24     Those four factors are the nature and circumstances of the

25     charged offense, the weight of the evidence, Mr. Lazar's

1    history and characteristics and the nature and seriousness

2    of the danger to the community that would be posed by

3    release.

4            The Court's assessment of danger must be

5    forward-looking, as clarified in *United States versus*

6    *Munchel*, which is a D.C. Circuit opinion.  To detain a

7    defendant on the grounds of dangerousness, the Court must

8    find that the defendant poses a continued, articulable

9    threat to an individual or the community that cannot be

10   sufficiently mitigated by release conditions.

11           The Munchel panel noted that the violent breach of

12   the Capitol on January 6th was a grave danger to our

13   democracy, and that those who participated could rightly be

14   subject to detention to safeguard the community.

15           The fact that the defendant posed a danger on

16   January 6th does not, standing alone, justify pre-trial

17   detention.  Instead, the Court must find that the defendant

18   poses a threat of committing violence in the future, now

19   that the circumstances of January 6th have passed.  That is

20   from *United States versus Munchel*.

21           I should also note that the Court in *Munchel*

22   indicated that individuals who are charged with engaging in

23   violence on January 6th are in sort of a different category

24   of dangerousness than individuals who were present on that

25   day and did not engage in violence or cheer it on.  But

nonetheless, I still have to apply the Bail Reform Act to either category of defendant, since there is no categorical rule or presumption of pre-trial detention based solely on charges of violent crimes at the Capitol.

In order to assess this prospective threat of danger to the community, I can look to a defendant's past conduct.  In support of that I would note that *United States v. McFarland* is a case that addresses that point; that's 2021 Westlaw 1614821.  *McFarland* explains this point and provides examples of other cases where that same principle has been recognized.  The past conduct I look to can include the alleged conduct underlying the charges, as well as other charges that is indicative of dangerousness.  However, as Judge Bates noted -- Judge Bates from this Court noted in *United States versus Klein,* when a defendant's conduct on January 6th, 2021 appears to be an aberration, that makes it more difficult to assess the defendant's future dangerousness.  So bearing all of those principles in mind, I will now go through the Bail Reform Act factors of this case.

First, I have assessed the nature and circumstances of the charged offense.  The factors that Chief Judge Howell identified in *United States versus Chrestman* are a helpful tool to evaluate whether the nature and circumstances of the offense charged here weigh for or

1    against pre-trial detention.

2             *Chrestman* identifies six considerations that help

3    inform this analysis:  Whether the defendant is charged with

4    felony or misdemeanor offenses, whether there is evidence of

5    prior planning, whether the defendant carried or used a

6    dangerous weapon, whether there is evidence that the

7    defendant coordinated with others before, during or after

8    the riot, whether the defendant assumed a formal or de facto

9    leadership role in the assault and also the defendant's

10   words and movements during the riot.  In this case at least

11   four of those *Chrestman* factors are present.  Mr. Lazar has

12   been charged with felonies.  The fact he dressed in

13   protective gear, with dark face --

14             COURTROOM DEPUTY:  Excuse me, Your Honor.  Your

15   Honor.  Your Honor.

16             THE COURT:  -- there were social media posts that

17   indicated that individuals should rise up and come armed;

18   and also suggesting that some people -- just a moment.

19             COURTROOM DEPUTY:  Your Honor, can you hear me?

20   Can anyone else hear me?

21             MR. BENOWITZ:  Yes, I can hear you.

22             COURTROOM DEPUTY:  Oh, okay.  All right.

23             Your Honor, I see you saying something but I can't

24   hear you.

25             THE COURT:  I just realized that I couldn't hear

1    anyone else, and I understand from Amanda that you were

2    saying something.

3                COURTROOM DEPUTY:  Yes.  Let me just check to make

4    sure we have a court reporter.  I thought maybe you might

5    have been reading a little too fast for the court reporter

6    but let me see.  Lorraine, are you ok?

7                COURT REPORTER:  Yes, thank you.

8                COURTROOM DEPUTY:  If anyone is ever speaking too

9    quickly, and sometimes I'm not always -- doing a couple

10   things and I don't catch it.  Please feel free to interrupt

11   so that you can get an accurate record.  Thanks.

12               COURT REPORTER:  Thank you.

13               THE COURT:  Okay.  Did anyone else say anything

14   when I was unable to hear?

15               COURTROOM DEPUTY:  No, it was just me.

16               THE COURT:  Okay.

17               Thank you.  Sorry about that.  I had turned my

18   volume down.  Okay.

19               Here are at least four of the *Chrestman* factors

20   are present.  Mr. Lazar has been charged with felonies.  The

21   fact that he dressed in protective gear with dark face paint

22   and was armed with chemical spray indicates at least some

23   degree of advanced planning.

24               In addition, the United States proffered that

25   Mr. Lazar had social media posts and reposting a comment

1  indicating that individuals should rise up and come armed,

2  and that some of the people should be executed or

3  euthanized.  These alleged social media posts, we don't have

4  a specific date, but the representation is that they were

5  from sometime in December of 2020 from the context.  The

6  chemical spray or the dangerous weapon, that was sprayed at

7  law enforcement.

8          There is no evidence of coordination with others

9  in advance of the attack, specific others, other than the

10 Facebook reposting.  I should note that with the Facebook

11 reposting, there's allegedly parts of that message were

12 circled and arrows were drawn.  But there was not evidence

13 of specific individuals being coordinated with in advance of

14 January 6th.  And the use of the bullhorn does not quite

15 amount to a leadership role, in my view, but there is

16 proffered evidence that Mr. Lazar yelled "forward" and

17 encouraged others to advance, and also encouraged the mob to

18 attempt to take weapons from law enforcement by yelling,

19 "Let's get their guns".

20         Mr. Lazar's alleged conduct demonstrated a

21 complete disregard for the rule of law, culminating in an

22 attack on law enforcement with a chemical spray.  While this

23 appears to have lasted only seconds, and there is no

24 evidence that Mr. Lazar was engaged in a prolonged physical

25 struggle with law enforcement, the charged offense is both

1      serious and violent.  As a result, I find that the nature

2      and circumstances of the charged offense place strongly in

3      favor of pre-trial detention.

4           Turning to the weight of the evidence, that also

5      weighs in favor of pre-trial detention.  The United States

6      has submitted two videos, which the Court viewed.  One

7      body-worn camera video shows Mr. Lazar brandishing and

8      deploying a chemical spray in the direction of law

9      enforcement, who were attempting to prevent the mob of

10     rioters from advancing beyond barriers.

11          Although it is difficult to identify Mr. Lazar's

12     voice among the mayhem, the United States has proffered that

13     the video captures him yelling "forward" and using

14     expletives to tell officers to "stand down".  In a video

15     from later that afternoon, Mr. Lazar states, "We maced

16     them."  This overwhelming evidence of dangerous conduct on

17     January 6th, also weighs in favor of pre-trial detention.

18          Next I have to consider Mr. Lazar's history and

19     characteristics.  Those are mixed.  Mr. Lazar has a criminal

20     record, which includes prior misdemeanor convictions for

21     criminal mischief, under Pennsylvania law, in 2004.  At

22     least one of which carried a potential sentence exceeding

23     one year.  It is unclear whether Mr. Lazar ever served that

24     amount of time as there is conflicting information about

25     whether he served 23 months, according to a police report,

1    or approximately 45 days.  It is possible that some portion

2    of that sentence was suspended, which would explain the

3    discrepancy.  Regardless, there does not seems to be a

4    dispute about whether the charge could have resulted in a

5    sentence that exceeds one year, which is significant because

6    it would mean that Mr. Lazar is an individual who is not

7    legally permitted to possess firearms.  Those are from 2004,

8    and as the defense noted, 17 years ago, Mr. Lazar was much

9    younger at that time.

10          More recently, the government has proffered that

11   Mr. Lazar was convicted for making a false statement on a

12   form in 2016, which was an attempt to obtain a firearm.  The

13   context of that has been represented to be as follows:  That

14   Mr. Lazar wanted to buy a weapon at a gun show and made

15   misrepresentations about his criminal history.  He did not

16   ultimately obtain the firearm.  The government also proffers

17   that he attempted to have a sibling get the firearm, but

18   that this purchase was rejected, but the false statement led

19   to a criminal conviction.

20          Mr. Lazar has no convictions for crimes of

21   violence.  I don't see anything in the criminal mischief

22   that suggests that it would inherently be a crime of

23   violence.  There are no direct firearm convictions in

24   Mr. Lazar's history.

25          He also has strong community support.  The defense

1    submitted exhibits in advance of the August 11th detention

2    hearing, which included letters from individuals who know

3    Mr. Lazar.  One of those letters states, I quote, Sam Lazar

4    is nothing but a respectable, caring, passionate,

5    self-giving, honorable man.  Sam is an asset to his

6    community and everyone around him.  Also references to how

7    he puts his family first.  There also is an email from a

8    neighbor who comments -- describes him as one of the kindest

9    and caring people that she has in her life.  Others talk

10   about his patience and kindness with his children.

11          There are numerous, numerous letters.  I won't

12   quote all of them.  There are many letters attesting to the

13   strong community support and friendship and relationships

14   that Mr. Lazar has, including letters from neighbors and

15   friends who have known him for varying periods of time.  So

16   those are all positive.  That is the positive aspect of the

17   history and characteristics, are the family ties, community

18   ties, community support.

19          Also, one thing I also considered under history

20   and characteristics are the exhibits that were submitted

21   from before the last hearing that we discussed today, which

22   included pictures of Mr. Lazar with a variety of firearms,

23   allegedly on a public street in August of last year.

24          Those photos, there has been no corroboration that

25   those are real firearms, that they were, in fact, loaded as

22

1    opposed to appearing to be loaded.  But it is significant,

2    given that Mr. Lazar has a criminal history, which would

3    prohibit him from lawfully possessing such firearms that he

4    was shown posing with weapons, including -- just a minute --

5    including an assault rifle, while participating in a rally

6    with a visible 30-round magazine, which may or may not have

7    been loaded.

8         Overall, I find the history and characteristics

9    are mixed.  So I find this factor to be neutral, as there

10   are some parts of it that favor detention and some parts of

11   it that would favor release.

12        So then I have to turn to the fourth factor, which

13   is the nature and seriousness of the danger to the community

14   that would be posed by release.  Here the specific

15   forward-looking risk that I am considering is whether

16   Mr. Lazar poses a risk of engaging in violent or otherwise

17   dangerous conduct at the least.  In this context, the

18   concern is that such conduct would be engaged in in

19   furtherance of political activity or beliefs similar to

20   January 6th.

21        In evaluating this, I have to consider whether if

22   there is such a risk, could release conditions adequately

23   mitigate that risk, including the proposal from the defense

24   that the Court use a third-party custodian and set

25   conditions such as home confinement.

1          I find this case to present a close question,

2    because although the conduct alleged from January 6th is

3    violent and serious and strongly favors detention, as I

4    noted in discussing the first factor, I must recognize as

5    the other courts have recognized in some other cases that

6    some time has passed since January 6th.  And the question

7    is, is there a current threat?

8          Ultimately, I conclude that there is still a

9    current danger of releasing Mr. Lazar.  In particular, the

10   recency of the rally.  I recognize that was prior to the

11   election, but the rally, the firearms in August of 2020,

12   followed then by the comments on social media in December,

13   and then the conduct on January 6th suggests that the

14   January 6th conduct was not truly such an aberration that it

15   is not predictive or indicative of ongoing danger.

16         I would also note that, I believe, Mr. Collyer

17   asserted at one of the earlier hearings, there is still an

18   ongoing perception or belief by many individuals at this

19   time, an illegitimacy of the current United States

20   president.  Although it's true there is no independent

21   evidence of that, I don't think the Court has to put on

22   blinders in evaluating this and ignore that these types of

23   issues that were addressed in those Facebook posts are still

24   in circulation among the public, among some segment of the

25   public.

1          So I find that the nature and seriousness of the

2    danger to the community also weighs in favor of detention,

3    because I think the combination of conduct between August

4    and January, to me at least, indicates that the Court would

5    need to be concerned that upon the release, Mr. Lazar would

6    engage in similarly dangerous conduct.

7          So when I balance all four of these factors, I

8    find that the government has carried its burden proving by

9    clear and convincing evidence that there are no conditions

10   of release that would reasonably assure the safety of the

11   community.

12         I gave serious consideration to home

13   incarceration.  And I will say, I think, but for the August

14   2020 rally and weapons, I might have found that to be

15   sufficient.  But when I combine all of the information

16   before me, I find the danger of release is too great.

17         And for those reasons, I conclude that Mr. Lazar

18   should be held without bond pending trial.  Of course, the

19   defense can appeal my decision to the presiding district

20   judge.  In this case that would be Judge Jackson.  The

21   appeal does not have to wait for written order from me.  I

22   have given a detailed ruling.

23         We have a court reporter so I believe a transcript

24   of my ruling today would provide the written basis for my

25   ruling; that said, I do intend to memorialize this in an

1    order, and it will read very similarly to what I just stated

2    on the record today.

3                Ms. Kay.  Do we know the next court date before

4    Judge Jackson?

5                COURTROOM DEPUTY:  No, Your Honor.  Her courtroom

6    deputy wasn't able to provide a next date.

7                THE COURT:  In terms of the transport of

8    Mr. Lazar, although Mr. Lazar has been moved somewhere, let

9    me at least add it is within the same state, I had issued an

10   order staying his transport pending the detention decision.

11   Do counsel want that order to remain in place until any

12   potential appeal before Judge Jackson or would the parties

13   be content with me lifting that stay at this time?

14               MR. BENOWITZ:  Your Honor, can I have a moment

15   with Mr. Lazar?

16               THE COURT:  Yes.

17               COURTROOM DEPUTY:  Okay.  Just wait a minute.

18   Hold on.

19               MR. BENOWITZ:  As well as Mr. Barbari.

20               COURTROOM DEPUTY:  Okay.  Wait a minute.  Hold on.

21   I need to close the breakout room that I have with the other

22   people.  Okay.  What happened to my defendant?  Hold on,

23   everybody.  I am having some problems here.

24               Mr. Stern?

25               MR. STERN:  Yes, ma'am?

1          COURTROOM DEPUTY:  What happened to Mr. Shorter?

2    Did you lose him in the breakout room?

3          MR. STERN:  No, I haven't done anything.  We were

4    together.  We were just reviewing paperwork.  I just got on

5    this screen.  I didn't even know I was --

6          COURTROOM DEPUTY:  Okay.  Okay, Mr. Benowitz, I am

7    going to put you in a breakout room with Mr. Lazar.  Hold on

8    a minute.  We will have to find our defendant.

9          THE COURT:  Will Mr. Shorter still be in there?

10          COURTROOM DEPUTY:  Well, I looked.  When I went to

11    close the breakout room, Mr. Shorter wasn't in the breakout

12    room.  I closed it, thinking he would pop up on the regular

13    screen.

14          MR. STERN:  He was in my sight until five or ten

15    seconds ago.

16          COURTROOM DEPUTY:  Well, maybe he will come back

17    on.  Hold on.  Let's see.

18          THE DEFENDANT:  I am here, Samuel Lazar.

19          COURTROOM DEPUTY:  I know you are here.

20          THE COURT:  Mr. Lazar, we are trying to put you in

21    a room virtually with your attorneys.

22          COURTROOM DEPUTY:  Okay.

23          Here is Mr. Lazar.  Mr. Shorter, can you hear me?

24    I don't think you are connected.  Just in case, I can't see

25    your name.  Okay.  We've got to find Mr. Shorter again.

1          Hi, Mr. Shorter.  Can you hear me?

2          DEFENDANT SHORTER:  Yes, I can hear you.

3          COURTROOM DEPUTY:  Somehow when we closed the

4    breakout room, we lost you.  I think you and Mr. Stern were

5    finished speaking, I'm sure.

6          DEFENDANT SHORTER:  Yes.

7          COURTROOM DEPUTY:  Okay.  We are just waiting.

8    Just a moment.

9          (Break.)

10         COURTROOM DEPUTY:  Your Honor, I cannot give them

11   too much time in breakout because we have to start

12   Mr. Shorter's hearing.

13         THE COURT:  I know.  I know.

14         COURTROOM DEPUTY:  I will give them one more

15   minute.

16         THE COURT:  Ms. Kay, you can give them a couple

17   minutes since we will be able to start Shorter as soon as we

18   wrap this up.

19         COURTROOM DEPUTY:  Okay.  Well, do you want me to

20   start Shorter now?

21         THE COURT:  No, I don't think so.  I just mean I

22   don't have very much left to do in Lazar.

23         COURTROOM DEPUTY:  Okay.  It's 4:18 now.  I don't

24   know how long Mr. Shorter's hearing is going to go.

25         THE COURT:  We can at least start it.

1          COURTROOM DEPUTY:  Oh, yeah, we will have time to

2     start it.  Okay.  We just may not complete it.

3          MR. STERN:  I don't believe the hearing will be

4     terribly long based on what I plan and the government plans.

5          COURTROOM DEPUTY:  All right.

6          THE COURT:  Did we lose Mr. Lazar?

7          COURTROOM DEPUTY:  I'm sorry.  The phone rang.  I

8     didn't realize everyone had came back out.  He is still in

9     the breakout room.  I just closed it.

10          THE COURT:  Okay.

11          MR. BENOWITZ:  Your Honor, after consulting with

12     Mr. Lazar, we'd like to ask the Court to order him to remain

13     at his current facility pending the appeal.

14          THE COURT:  I lost you.  Pending what?

15          MR. BENOWITZ:  Pending an appeal.

16          THE COURT:  Pending the appeal?

17          MR. BENOWITZ:  Yes.

18          THE COURT:  Mr. Collyer, any objection to that

19     request?

20          MR. COLLYER:  Your Honor, the government would

21     request that Mr. Lazar be transported to the District of

22     Columbia for further proceedings on the indictment.

23          THE COURT:  You would ask that he be brought to

24     the District of Columbia for further proceedings?

25          MR. COLLYER:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you.  I will take that

2     under advisement.  I need to get started on my next hearing.

3     If I decide to lift the stay, it will be done by order.

4     Okay.

5          Are there any other issues that need to be

6     addressed before I remand Mr. Lazar into custody?

7          MR. COLLYER:  Your Honor, I understand that there

8     is no next date at this time.  The government would ask that

9     the Court toll speedy trial time from today until the next

10    court appearance before Judge Jackson.  My understanding is

11    that defense has no objection to that.

12         MR. BENOWITZ:  Your Honor, this is David Benowitz.

13    That's correct, we have no objection to the tolling of the

14    speedy trial clock.

15         THE COURT:  Okay.  Until what date, since we don't

16    know the date?

17         MR. COLLYER:  Whenever the next appearance before

18    Judge Jackson will be.  To be set, is my understanding.

19         THE COURT:  Okay.  I need to put an end date on

20    the tolling.

21         MR. BENOWITZ:  Your Honor, if we can select 60

22    days, I think that's approximately 60 days.

23         THE COURT:  Okay.  Would 60 days work for the

24    United States?

25         MR. COLLYER:  Yes, Your Honor.  Thank you.

1          THE COURT:  Since that's probably longer than it

2     will take to get before Judge Jackson, is there any other

3     rationale for it to be the ends of justice to toll that

4     time?

5          MR. COLLYER:  Yes, Your Honor.  As the Court's

6     aware, there is voluminous discovery in this case.  I have

7     entered a protective order that is just awaiting Judge

8     Jackson's signature, which will allow me to informally

9     produce discovery to defense; however, the formal production

10    of that discovery will take some months still from today.

11         THE COURT:  Okay.  Thank you.  I will exclude time

12    for 60 days beginning today.

13         Ms. Kay, do we know what the 60th day from today

14    is?  If not, we can fill it in after the hearing, perhaps.

15         COURTROOM DEPUTY:  I don't, Your Honor.

16         THE COURT:  Okay.  I will exclude time for 60 days

17    from today.  Just one second while I get that date, which

18    would be -- it falls on a Saturday, October 30th.  So I will

19    run that through the next business day, which will be

20    November 1st, 2021.

21         I find that exclusion of time best serves the ends

22    of justice and outweighs the interests of Mr. Lazar and the

23    public in a speedy trial, given that it will provide time

24    for the parties to get a next hearing date before Judge

25    Jackson, which appears likely to include an appeal of the

1    detention ruling, and will also take into account what is

2    anticipated to be very voluminous discovery and provide an

3    opportunity for the United States to organize, review and

4    begin producing that discovery subject to approval of the

5    pending motion for protective order.  So for those reasons,

6    ends of justice continuance of the speedy trial clock is

7    warranted through November 1st, 2021.

8            Was there anything further from the government or

9    the defense?

10           MR. COLLYER:  No, Your Honor.  Thank you.

11           MR. BENOWITZ:  No, Your Honor.

12           THE COURT:  Thank you.

13           I remand Mr. Lazar into the custody of the

14   marshals to be held without bond for the reasons stated on

15   the record; that concludes this matter.

16           Thank you to the third-party custodian for being

17   available throughout the many hearings that we had in this

18   case.  That concludes this matter.  Counsel, you are

19   excused.  Mr. Lazar, you can let -- oh, I see there is

20   someone there.  You can let them know that your hearing is

21   done.  Thank you.

22           MR. BENOWITZ:  Thank you, Your Honor.

23           (Proceedings concluded at 4:24 p.m.)

24

25

1                        **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8                   **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14    _September 6, 2021_            ___/s/_____
              **DATE**                      **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25